In re **DOMESTIC FUEL CORP., Debtor.**

**DOMESTIC FUEL CORP., Debtor, Plaintiff,**

v.

**Angelo P. RAINALDI, Defendant.**

**Bankruptcy No. 87 B 20004. Adv. No. 87 ADV. 6002.**

United States Bankruptcy Court, S.D. New York.

April 3, 1987.

Sitomer & Odesser, P.C., Corporate and Litigation Attys., New York City, for debtor; Gary J. Langer, of counsel.

Aronwald & Pykett, White Plains, N.Y., for Angelo P. Rainaldi; Daniel Pykett, of counsel.

Marc Stuart Goldberg, P.C., New York City, for debtor.

## MOTION AND CROSS–MOTION REGARDING DISPOSITION OF PLEDGED STOCK

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Angelo Rainaldi ("Rainaldi"), a secured creditor in whose favor stock of two subsidiary companies of the debtor corporation, Domestic Fuel Corp., had been pledged by the debtor to secure payment to him of the selling price of the stock, exercised self-help and purported to sell to himself at a noticed sale title to the pledged stock. Rainaldi then called shareholders' and directors' meetings and elected himself the sole director and the president of the subsidiaries, ousting the debtor's management from possession and control. The debtor moved for an order; (a) directing Rainaldi, his servants, agents and employees, to remove themselves from the subsidiaries' premises and to cease interfering with their operations; and (b) holding Rainaldi guilty of contempt for his willful and malicious interference with the subsidiaries' operations and his violation of the Bankruptcy Code.

Rainaldi moved for an order appointing himself as the sole authorized signator on the subsidiaries' bank accounts and for a substitution of attorneys for the subsidiaries to replace the attorneys who had been retained by the ousted management.

### FINDINGS OF FACT

1. On January 6, 1987, Domestic Fuel Corp., a New York corporation, and Henry F. Raab, Inc., a wholly-owned New York subsidiary corporation of Domestic Fuel Corp., filed with this court separate petitions for reorganization under Chapter 11 of the Bankruptcy Code. Both corporations continued in possession of their assets and managed their businesses in accordance with 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code.

2. On August 15, 1985, the plaintiff, Angelo P. Rainaldi ("Rainaldi"), sold to the debtor, Domestic Fuel Corp. ("Domestic") all of his interest in Henry F. Raab, Inc. of New York and Henry F. Raab Connecticut, Inc. (collectively referred to as "Raab"). From 1977 to August 15, 1985, the plaintiff had been the chief operating officer and sole shareholder of both Raab corporations.

3. The written stock purchase agreement between the plaintiff and the debtor, Domestic Fuel Corp., dated June 25, 1985 recited that the plaintiff owned 9,200 shares of the New York Raab corporation and 100 shares of the Connecticut Raab corporation, which he agreed to sell to Domestic Fuel Corp. for $1,500,000 and $100,000 respectively, for a total of $1,600,000. In exchange for the Raab stock the debtor, Domestic Fuel Corp., agreed to pay to the plaintiff at the closing two certified checks, one for $590,000 and one for $10,000, for a total of $600,000. The balance of the purchase price, amounting to $1,000,000 was to be paid in 120 equal monthly principal payments, with interest at prime paid monthly on the unpaid balances.

4. As security for the payment of the unpaid part of the purchase price, the agreement provides that the plaintiff is to have a lien upon the Raab stock and, at the closing, Domestic Fuel Corp. "shall deliver to the Chase Manhattan Bank, hereinafter called the 'Escrow Agent', under terms and provisions of the escrow agreement, the certificates evidencing such shares. The shares purchased by the buyer shall be transferred on the books of Raab, Inc., and Raab Connecticut, respectively, and new certificates in the name of the Buyer shall be issued. Said shares shall be delivered to the Escrow Agent accompanied by duly executed stock powers."

5. At the closing on August 15, 1985, the plaintiff and the debtor, Domestic Fuel Corp., entered into an escrow agreement which they signed and which substituted Marine Midland Bank of White Plains, New York as the escrow agent instead of Chase Manhattan Bank, as originally designated in the stock purchase · agreement dated June 25, 1985. Marine Midland Bank refused to act as the escrow agent and did not sign the escrow agreement which the parties delivered to it at the closing together with the purchase agreement, the Raab stock and the endorsed-in-blank stock powers.

6. The Raab stock certificates endorsed-in-blank and stock powers which the debtor delivered to Marine Midland Bank at the closing were placed in a convenience vault which Marine Midland Bank employed for its own internal use, as distinguished from the safe deposit boxes which are used for public and business purposes. Marine Midland Bank continues to hold the Raab stock certificates and the endorsed-in-blank stock powers because the parties never designated an escrow agent.

7. For purposes of the closing, the Raab shares owned by the plaintiff were transferred on the books of the two Raab corporations and new certificates were issued in the name of the debtor, Domestic Fuel Corp. These certificates were not endorsed. Instead, separate stock powers for 9200 shares and 100 shares of Henry J. Raab, Inc. and Henry F. Raab Connecticut, Inc. were signed in blank by the debtor, Domestic Fuel Corp. The debtor's attorney asked Marine Midland's assistant vice president, Malcolm C. Whittemore, to hold the Raab shares and the endorsed stock powers with the hope that Marine Midland might reconsider its refusal to act as the escrow agent for the purchase transaction.

8. The debtor paid only the interest due under the first three monthly promissory notes which it issued to the plaintiff at the closing on August 15, 1985. The debtor made no payments of principal. The debtor made no further payments to the plaintiff after November 15, 1985.

9. On January 18, 1987, Rainaldi moved this court for relief from the automatic stay in the Domestic case so that he might enforce his security interest in Raab and Raab Connecticut stock which had been pledged by Domestic to secure its indebtedness to him.

10. On February 24, 1987 this court issued its Opinion on the motion which found that:

(a) Angelo Rainaldi was a secured party whose constructive possession of the stock by a third person pursuant to N.Y. U.C.C. §§ 8–313 had perfected his interest.

(b) the secured creditor was not adequately protected and was entitled to relief from the automatic stay for cause as authorized under 11 U.S.C. § 362(d)(1).

11. On February 27, 1987, this court entered an order in accordance with its Opinion.

12. Subsequent to these events Rainaldi caused a notice, dated March 4, 1987, to be served on Domestic and Richard Smyth, the president of both debtors, of his intention to sell his shares of the stock on March 19, 1987 at the offices of Aronwald & Pykett, 925 Westchester Avenue, White Plains, New York.

13. A copy of the notice of sale which was published in the March 11, 1987 edition of the New York Times, stated, among other things:

(a) that the shares were in the possession of the Marine Midland Bank.

(a) the sale was without warranty and the shares were to be sold "where is as is".

(c) the purchaser would be responsible for obtaining possession and control of the shares.

14. On March 18, 1987, debtors' trial counsel sent a telegram objecting to the sale.

15. On March 19, 1987, a sale of the stock was held. The debtors' agent, an accountant was present. No bidders other than Rainaldi were present at the sale. Rainaldi's bid of $100 was accepted and Rainaldi made out a bill of sale to himself for the shares, dated March 19, 1987.

16. Rainaldi, in the capacity of sole shareholder of Raab New York and Raab Connecticut, held a shareholders' meeting and elected himself sole director. Immediately thereafter, Rainaldi appointed himself as president and his children as other officers of the two corporations.

17. On March 20, 1987, Rainaldi entered the Raab premises and, as president, took over possession and the operation of the Raab corporation. Rainaldi caused the locks to be changed and excluded the debtor's then president, Richard Smyth, from entering the building.

18. On March 23, 1987, Rainaldi moved by order to show cause to have himself authorized to be the sole signatory on the corporate bank accounts and to have the debtors' attorneys Marc Goldberg, P.C. and Sitomer and Odesser replaced by the firm of Aronwald & Pykett. On March 24, 1987, Richard Smyth and the debtor, Domestic, moved by order to show cause for a preliminary injunction in the adversary action to enjoin Rainaldi from interfering with debtor Raab's business, compelling the ouster of Rainaldi from the premises and for Rainaldi to be held in contempt of the automatic stay and to have the sale on March 19, 1987 declared invalid for failure to comply with this court's order of February 27, 1987 and the requirements of the U.C.C.

## DISCUSSION

The debtor asserts that the order which recited that Rainaldi may "move" to enforce his security interest, when combined with the denial of his motion to compel a turnover of the stock from the bank to himself, constitutes a direction from this court that the stay was lifted only to the extent of allowing a reclamation complaint to be asserted against the debtor and the Bank. This is logically at odds with the order and the Bankruptcy Code. All that this court ruled was that the stay was lifted so that Rainaldi might proceed in any manner consistent with law to enforce his security interest in the stock. *In re Domestic Fuel Corp.*, 70 B.R. 455, 460 (Bank. S.D.N.Y.1987). The denial of Rainaldi's motion for an order compelling the Bank to turn over the stock certificates simply meant that such an order must be sought by filing an adversary complaint pursuant to Bankruptcy Rule 7001 and that the bank must be served. Rainaldi was not required to move to lift the stay before filing an adversary complaint to acquire possession of the Raab stock.

The crucial issue in this case is whether Rainaldi, as a secured creditor, acquired the status of a shareholder of Raab when he foreclosed his security interest in the Raab stock by purporting to sell the stock to himself at a publicly noticed sale at a time when the stock was in the possession of the Marine Midland Bank.

This court has already held that for purposes of perfecting Rainaldi's interest as a secured creditor, the debtor's pledge of the Raab stock with the bank was constructive notice within the meaning of Article 8 of the U.C.C. and that no U.C.C. filing was required in order for Rainaldi to acquire a security interest in the stock. Rainaldi now contends that he did not need actual possession of the Raab stock certificates in order to sell the stock at his foreclosure sale because he had constructive possession of the stock as a result of the debtor's delivery of the stock to Marine Midland Bank. The fact that Marine Midland qualified as a financial intermediary for purposes of perfecting a security interest under Article 8 of the U.C.C. does not mean that the bank acted as an agent for Rainaldi for purposes of applying the concept of constructive possession. Quite to the contrary, the bank refused to act as an escrow agent because of a conflict of interest and requested the parties to obtain another escrow agent, which they failed to do. The bank refused to honor Rainaldi's demand for delivery of the Raab stock to him and would not turn over the stock to either party after the commencement of this Chapter 11 case without the benefit of a court order. The bank is merely a stakeholder or bailee and is not Rainaldi's agent for the disposition of his secured interest.

Rainaldi was required to resort to a foreclosure sale in order to call a shareholders' and directors' meeting of Raab because the Raab shares were never transferred to Rainaldi's name on the books of Raab as record holder and the security agreement did not expressly give Rainaldi the right, in the event of a default in payment by the debtor, to exercise all voting and corporate rights at any meeting of shareholders of Raab as if Rainaldi were the absolute owner of the Raab shares. A provision to this effect would have been honored without the need for Rainaldi's attempt to obtain title to the Raab shares through a foreclosure sale. *In re Eastern Bancorporation,* 23 B.R. 474, 477 (Bankr.E.D.Pa.1982) (the pledge agreement expressly provided that in the event of a default, the pledgee *"may, without notice, exercise all voting and corporate rights at any meeting of the shareholders* ... as if it were the absolute owner thereof...."). Absent such language, the debtor, as the pledgor, retained the right to sell the stock subject to the security interest, vote the stock and receive all dividends. *See Simpson v. The Jersey City Contracting Company,* 165 N.Y. 193, 58 N.E. 896 (1900); *The Sire Plan, Inc. v. Mintzer,* 38 Misc.2d 920, 237 N.Y.S.2d 123 (Sup.Ct.N.Y.Co.1963) (trustee in bankruptcy still entitled to vote self as director and president as record holder of stock where pledgee failed to demand a proxy pursuant to § 47 N.Y. Stock Corporation Law (now N.Y.B.C.L. § 609); *The Monitor Company v. Confianza Furniture and Appliance Corp.,* 142 N.Y.S.2d 140, 142 (Sup.Ct. Kings Co. 1955). "Until a pledge of stock has been enforced and the title made absolute in the pledgee and the name has been changed on the corporate books, the pledgor is entitled to vote, ..." (citations omitted) *see also* N.Y.B.C.L. § 612.

### THE FORECLOSURE SALE

Although Article 8 of the New York U.C.C. applies to investment securities for purposes of determining issues involving negotiation and transfer, including the creation of security interests in investment securities, reference must be made to the agreement itself and to Article 9 of the New York U.C.C. in order to ascertain a secured party's rights in the event of a default under the security agreement.

In paragraph #18 of the July 11, 1985 rider to the stock purchase agreement, it is stated in relevant part as follows:

If at any time there occurs a default in the payment by the Buyer of principal or interest of any of the installments due under the aforesaid two Notes and said

default continues for 45 days the Seller shall notify the Buyer and the Buyer shall have an additional 45 days in which to make said payment and in the event that said default continues without payment for 45 days the Seller shall notify the Escrow Agent and the *Escrow Agent shall deliver all of the share certificates* pledged as above to the Seller or his assigns, heirs or personal representatives, as the case may be.

(Emphasis added). Rainaldi's contractual right of sale was contingent upon repossession and the giving of an appropriate notice of the intended sale.

Repossession is provided for under § 9–503 of the New York U.C.C., which reads as follows:

Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under Section 9—504.

After obtaining repossession of the secured collateral, a secured party may dispose of the collateral in accordance with New York U.C.C. § 9–504. which authorizes appropriately noticed public or private sales.

From the foregoing it may be concluded that repossession of the pledged collateral by the secured party is essential to the commercial reasonableness of the disposition because New York U.C.C. § 9–504 imposes liability on the secured party in favor of the debtor in the event of an improper disposition of the collateral. Moreover, a transferee's title depends upon whether or not the purchase was made in good faith or bad faith. In determining all aspects of the disposition, it is essential that the sale must have been "made in a commercially reasonable manner". This criterion is imposed under New York U.C.C. § 9–507(2). Hence, nonrepossession by the secured party is a critical factor in determining the commercial reasonableness of this sale. *See Spickler v. Lombardo*, 25 U.C.C. 1500 at 1514 (Pa.C.P. Sommerset Co.1978):

So, nonrepossession must be separately evaluated as bearing on commercial reasonableness or unreasonableness for purposes of determining liability of the secured party to the debtor, and as bearing on the good faith of the buyer at a private sale of nonrepossessed collateral.

That a secured party must first repossess the collateral after a default before a commercial reasonable disposition can take place was stated as axiomatic in J. White and R. Summers, Handbook of the Law Under the Uniform Commercial Code § 26–5 (2d ed. 1980).

If after default, the secured creditor chooses to satisfy the debt by means of strict foreclosure or by resale of the collateral, *he must first repossess it.* His right to repossess the collateral is the secured creditor's ultimate weapon against a defaulting debtor; ..."

(Emphasis added).

Having failed to obtain possession of the Raab stock which the debtor delivered to Marine Midland Bank, Rainaldi may not derive any comfort from the fact that the bank still retains possession of the stock. The bank never acknowledged that it held the stock as agent for Rainaldi and will not deliver the stock to anyone without a court order. All that Rainaldi could sell at the so-called foreclosure sale was whatever secured interest he had in the collateral, which clearly fell short of absolute ownership. He simply took $100 from one of his pockets and put the money into another of his pockets. These gyrations did not amount to ownership of the stock or result in Rainaldi's right to vote the stock and change the management of the Raab corpo-

rations. In the event of a default, Rainaldi had the right to seek a judicial sale of the stock or to proceed with a nonjudicial sale after first having obtained repossession of the stock peaceably or by means of a replevin action.

Having concluded that Rainaldi's premature attempt to replace the Raab management was ineffectual, there is no need to address the debtor's argument that Rainaldi's notice of intended sale did not satisfy the test of commercial reasonableness. However, it should be noted that it has been held that a notice with respect to the shares of closely held corporations should disclose "what kind of business, if any, the corporations conducted or as to what their assets or liabilities were and ... that the shares offered for sale were the whole outstanding stock of the corporations." *In re Kiami*, 309 N.Y. 325, 330, 130 N.E.2d 745 (1955); *Accord* N.Y. Lien Law §§ 201, 202, 202–a.

## THE DEBTOR'S RELIEF

■ Although the debtor is entitled to an order removing Rainaldi and his employees from the Raab premises, it does not follow that the debtor is entitled to hold Rainaldi liable for violating the Bankruptcy Code. The court had already lifted the automatic stay, as previously requested by Rainaldi, so that he might proceed to enforce his secured rights. Rainaldi's failure to comply with the requirements of the Uniform Commercial Code in attempting to effect a valid disposition of interest in the Raab stock does not constitute a violation of the Bankruptcy Code. If, as a result of Rainaldi's exercise of self-help, the debtor has sustained damages, the debtor may seek compensation in an appropriate proceeding independently of 11 U.S.C. § 362(h)), which deals with willful violations of the stay imposed under § 362.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(b)(2)(A). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

2. Rainaldi's failure to obtain possession of the Raab stock which the debtor delivered to Marine Midland Bank, a financial intermediary which did not hold such stock as agent for Rainaldi, prevented Rainaldi from effectively exercising his right of self-help and impaired the validity of the attempted nonjudicial sale of the absolute ownership of the Raab stock, which was held on March 19, 1987.

3. The debtor's motion for an order directing Rainaldi, his servants, agents and employees to remove themselves from the premises of the Raab corporations and to cease interfering with their operations is granted, so long as he has not acquired ownership of the Raab stock.

4. The debtor's motion for an order holding Rainaldi guilty of contempt of this court for his alleged willful and malicious interference with the debtor's operations and his alleged violations of the Bankruptcy Code, is denied without prejudice to any action the debtor might commence for any damages sustained as a result of such conduct.

5. Rainaldi's motion for an order (a) appointing him as the sole authorized signatory on the Raab bank accounts; (b) designating him as the financial manager of the Raab corporations; and (c) substituting Aronwald & Pykett as attorneys for the Raab corporation, is denied.

SUBMIT ORDER on notice.